**SO ORDERED: June 16, 2015.**



**Jeffrey J. Graham**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LESTER L. LEE, | ) | Case No. 12-90007-JJG-7A |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| MICHAEL J. WALRO, as Trustee of | ) | |
| the Bankruptcy Estate of | ) | |
| Lester L. Lee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 13-59041 |
| | ) | |
| BRENDA LEE, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes before the Court on the *Amended Complaint* filed by

Plaintiff Michael J. Walro, as Trustee of the Bankruptcy Estate of Lester L. Lee (the

"Trustee"), against Defendant Brenda Lee ("Brenda").  Following a trial held on

February 18-19, 2015, the Court took the matter under advisement.  Having

considered the evidence and the testimony offered by the parties, as well as their

pre-trial briefs, the Court hereby issues the following Findings of Fact and

Conclusions of Law.

## Findings of Fact

1.      Debtor Lester L. Lee ("Debtor" or "Lee") filed a voluntary petition for

relief under Chapter 7 of the United States Bankruptcy Code (the "Code") on

January 3, 2012 (the "Petition Date").

2.      At all times relevant to this proceeding, Brenda was, and is, married to

Lee.

3.      The Lee Group Holding Company, LLC (the "Lee Group") is an Indiana

limited liability company owned by Brenda, Larry L. Lee, Melinda Gabbard and

Debra Brown.[1]  Brenda owns a 40% interest in the Lee Group, while Larry, Melinda

and Debra each own a 20% interest.

4.      Brenda did not make an initial investment to acquire her interest in

the Lee Group.

5.      Lee has served as the "Manager" of the Lee Group.

6.      Marion T, LLC ("Marion T") is a wholly-owned subsidiary of the Lee

Group.

7.      By Quitclaim Deed dated January 2, 2009, and recorded on May 25,

2010, Lee conveyed to Brenda certain real estate in Shelby County described as:

---

[1] Larry L. Lee ("Larry"), Melinda Gabbard ("Melinda") and Debra Brown ("Debra") are Lee's
adult children.

Part of the Southeast Quarter of Section 33, Township 13 North, Range 7 East, Addison Township, Shelby County, Indiana, the following is intended to be part of that land described in Deed Record 299, Page 266, and described as follows:

Commencing at the Southeast Comer of said section: thence North 89° 10'54" West (an assumed bearing) along the South line of said Section a distance of 833.85 feet to the Southwest comer of "Tract A" as shown on Reference Survey #1 (Benchmark Surveying, dated August 2, 2002) and the Point of Beginning; thence continuing North 89° 10' 54" West along said South line a distance of 360.76 feet to the Southwest comer of subject land (D.R. 299. P. 266); thence North 00° 00'00" East along the West line of subject land a distance of 668.04 feet to the center of the Little Blue River as shown on Reference Survey #2 (Pace Engineering, Inc. dated September 6, 2002); the next 4 calls are along said river as shown on said Reference Survey #2; thence North 53° 58' 49" East a distance of 31.66 feet; thence North 11° 59' 12" East a distance of 339.15 feet; thence North 02° 57' 30" West a distance of 213.92 feet; thence North 15° 46' 45" West a distance of 403.87 feet to the North line of subject land (D.R. 299, P.266); thence South 88° 52' 32'" East along said North line a distance of 768.24 feet to the West right of way line of Interstate 74 and a curve to the left; thence Southeasterly along said curve and said right of way line for an arc distance of 314.14 feet, having a radius of 7784.44 feet; said curve has a chord bearing South 45° 51' 01" East a distance of 314.12 feet to the Northwest corner of said "Tract A"; thence South 44° 19' 50" West along the Northwest line of said "Tract A" a distance of 872.50 feet to a corner of said "Tract A"; thence South 00° 06' 12" East along the West line of said "Tract A" a distance of 768.26 feet to the point of beginning, containing 19.07 acres, more or less and subject to all legal rights of way and easements.

Excepting therefrom the following described Parcel:

Part of the Southeast Quarter of Section 33, Township 13 North, Range 7 East, Addison Township, Shelby County, Indiana, the following description intended to be part of that land described and recorded in Instrument Number 0301095, and described as follows:

Commencing at a Shelby County Surveyors Standard Monument (found) marking the Southeast Comer of said Section 33; thence North 01° 02' 12" West (an assumed bearing) along the East line of said Quarter Section a distance of 961.95 feel to the Northerly right of way of Lee Boulevard; thence North 65°40 31" West along said right of way a distance of 497.40 Feet to 5/8" rebar and cap (set), and the point of beginning: thence North 43°18'56" East along said right of way a distance of 15.04 feet to a 5/8" rebar and cap (set) at the PC of a curve to

3

the right; thence Northwesterly along said curve and arc distance of 248.66 feet, having a radius of 555.00 feet, and a chord bearing North 54°18'28" West a distance of 246.59 Feet to a 5/8" rebar and cap (set) at the PT thereof; thence North 28°49'47" West a distance of 182.75 Feet to a 5/8" rebar and cap (set); thence North 07°08'27" West along said right of way a distance of 134.01 Feet to 5/8" rebar and cap (set); thence North 89°55'26" West a distance of 125.11 Feet to the Southerly right of way of Lee Boulevard and a 5/8" rebar and cap (set) at the PC of a curve to the left; thence Southeasterly along said curve an arc distance of 397.11 Feet, having a radius of 650.00 Feet, and a chord bearing South 24°04'01" East a distance of 390.96 feet to a point on said curve; thence continuing Southeasterly along said curve an arc distance of 234.17 feet, having a radius of 650.00 feet, and a chord bearing South 51°53'23" East a distance of 232.91 feet to a point on said curve; thence continuing Southeasterly along said curve and arc distance of 20.85 feet, having a radius of 650.00 feet, and a chord bearing South 63°07'47" East a distance of 20.85 feet to a 5/8" rebar and cap (set) at the PT thereof: thence North 43°18'56" East along said right of way a distance of 21.90 feet to a 5/8" rebar and cap (set); thence continuing North 43°18'56" East a distance of 63.45 feet to the point of beginning containing 1.45 acres more or less, subject to all legal rights of way and easements.

("Property No. 1").

8.     By Quitclaim Deed dated January 2, 2009, and recorded on May 25,

2010, Lee conveyed to Brenda certain real estate in Shelby County, Indiana

described as:

Part of the Northwest Quarter of Section 3, Township 12 North, Range 7 East, Addison Township, Shelby County, Indiana, described as follows: Beginning at a railroad spike on the south line of said Southwest Quarter, distance 691.23 feet east of northwest corner of the Northwest Quarter of Section 3, Township 12 North, Range 7 East; thence South 00 degrees 20 minutes 10 seconds West, 185.85 feet to the north right-of-way line of State Road 44; thence South 62 degrees 32 minutes 50 seconds West along said right-of-way, 259.07 feet; thence North 27 degrees 50 minutes 09 seconds West, 228.80 feet to point on a curve having a radius of 230.00 feet, the radius point of which bears North 34 degrees 11 minutes 11 seconds West, thence northeasterly along said curve, an arc length of 112.69 feet to a point which bears South 62 degrees 15 minutes 30 seconds East from said radius point; thence North 25 degrees 17 minutes 18 seconds East, 8.64 feet; thence South 88 degrees 59 minutes 50 seconds East, 41.63 feet; thence North 27 degrees 50 minutes 09 seconds West, 18.84 feet to the north line

4

of said Northwest Quarter; thence South 88 degrees 59 minutes 50 seconds East 227.01 feet to the Point of Beginning, containing 1.68 acres, more or less.

("Property No. 2").

9.    By Quitclaim Deed dated January 2, 2009, and recorded on May 25, 2010, Lee conveyed to Brenda certain real estate in Shelby County, Indiana described as:

Part of the Southwest Quarter of Section 34, Township 31 North, Range 7 East, Addison Township, Shelby County, Indiana, as described as follows:

Beginning at a railroad spike on the south line of said Southwest Quarter, distant 691.23 feet east of northwest corner of the Northwest Quarter of Section 3, Township 12 North, Range 7 East; thence North 88 degrees 59 minutes 50 seconds West, 227.01 feet; thence North 27 degrees, 50 minutes 09 seconds West, 28.60 feet; thence North 25 degrees 17 minutes 18 seconds East, 565.61 feet to the west line of the real estate described in deed to Shelbyville Motel Associates, per Deed Book 299, Pg. 552 in the Office of the Recorder of Shelby County, Indiana; thence South 00 degrees 08 minutes 09 seconds West along the west line thereof, 540.67 feet to the Point of Beginning, containing 1.56 acres, more or less.

("Property No. 3").

10.    Lee conveyed to Brenda certain real estate in Shelby County, Indiana by Quitclaim Deed dated January 2, 2009, and recorded on May 25, 2010:

Part of the Southeast Quarter of Section 33, and Part of the Southwest Quarter of Section 34, Township 13 North, Range 7 East, Addison Township, Shelby County, Indiana, described as follows:

Commencing at the southeast corner of said Southeast Quarter; thence North 89 degrees 04 minutes 14 seconds West, 283.73 feet to the northwest corner of the Northwest Quarter of Section 3, Township 12 North, Range 7 East; thence continuing North 89 degrees 04 minutes 14 seconds West, along the south line of said Southeast Quarter, 550.12 feet; thence North 00 degrees 00 minutes 00 seconds West, 768.15 feet; thence North 44 degrees 26 minutes 02 seconds East, 551.64 feet to the Point of Beginning; thence continuing North 44 degrees 26 minutes 02 seconds East 320.97 feet to the southwesterly right-of-way of

5

Interstate 74, being a point on a curve having a radius of 7784.44 feet, the radius point of which bears North 42 degrees 59 minutes 46 seconds East, (the following 7 courses being along said southwesterly right-of-way): (1) thence southerly along said curve, an arc length of 280.46; (2) thence North 00 degrees 06 minutes 12 seconds East, 40.18 feet; feet to a point on a curve having a radius of 7731.91 feet, the radius point of which bears North 41 degrees 02 minutes 51 seconds East; (3) thence southerly along said curve an arc length of 40.66 feet to a point which bears South 49 degrees 06 minutes 40 seconds East from said radius point; (4) thence South 45 degrees 58 minutes 06 seconds East, 149.36 feet to a point on a curve having a radius of 7765.44 feet, the radius point of which bears North 39 degrees 38 minutes 17 seconds East; (5) thence southeasterly along said curve an arc length of 304.95 feet to a point which bears South 37 degrees 23 minutes 17 seconds West; (6) thence South 39 degrees 11 minutes 21 seconds East, 104.83 feet to a point on a curve having a radius of 7790.44 feet, the radius point of which bears North 36 degrees 38 minutes 21 seconds East; (7) thence Southeasterly along said curve an arc length of 169.44 feet to a point which bears South 70 degrees 23 minutes 35 seconds West from the radius point; thence South 36 degrees 09 minutes 38 seconds West, 199.21 feet to the existing right of way line of Lee Road, said point being a point on a curve having a radius of 45.20 feet, the radius point of which bears North 35 degrees 50 minutes 36 seconds East; thence Northerly along said curve, an arc length of 27.62 feet to a point of reversed curvature having a radius of 72.00 feet, the radius point of which bears South 70 degrees 37 minutes 18 seconds West; thence northwesterly along said curve an arc length of 40.06 feet to a point which bears North 38 degrees 44 minutes 32 seconds East from said radius point; thence North 51 degrees 15 minutes 28 seconds West, 450.26 feet to a point on a curve having a radius of 132.00 feet, the radius point of which bears South 38 degrees 44 minutes 32 seconds West, thence northwesterly along said curve, an arc length of 30.64 feet to a point which bears North 25 degrees 26 minutes 37 seconds East from said radius point; thence North 64 degrees 33 minutes 23 seconds West, 531.00 feet to the Point of Beginning, containing 5.26 acres, more or less.

("Property No. 4").[2]

11.    Brenda did not provide any consideration for the Transferred Real Estate beyond what she describes as "love and affection" as Lee's wife.

---

[2] Together, Properties Nos. 1-4 shall be referred to as the "Transferred Real Estate" and the transfers themselves shall be referred to as the "Real Estate Transfers")

12.     Property No. 2 was sold to SHIV Development, LLC on April 28, 2010 for $550,000.00, with $202,345.86 in net proceeds to the seller.  Per the Seller's Closing Statement for the sale, the "seller" was identified as Lee, not Brenda.

13.     The proceeds from the sale were immediately "loaned" to the Lee Group, evidenced by a note payable to Brenda and Lee.

14.     Prior to January 5, 2009, Lee was the sole shareholder of Johnson County Motel Corporation ("JCMC").  That interest consisted of 50 shares of JCMC stock (the "JCMC Shares").

15.     Prior to January 5, 2009, Lee was the sole shareholder of Bi-Rite Oil Co., Inc. ("Bi-Rite").  That interest consisted of 100 shares of Bi-Rite stock (the "Bi-Rite Shares).

16.     On January 5, 2009, Lee transferred the JCMC Shares and Bi-Rite Shares to Brenda (the "Stock Transfers").

17.     Brenda did not provide any consideration for the Stock Transfers beyond what she describes as "love and affection" as Lee's wife.

18.     According to the company's own balance sheet, JCMC had assets of $2,218,879.32 and liabilities of $0 as of December 31, 2008.

19.     In a Final Statement of Financial Position, Lee valued his ownership interest in JCMC as of October 31, 2008 at $2.6 million.

20.     According to its own balance sheet, Bi-Rite had assets of $2,058,192.33 and liabilities of $723,632.23, for a net worth of $1,334,560.10 as of December 31, 2008.

21.    In his Final Statement of Financial Position, Lee valued his ownership interest in Bi-Rite as of October 31, 2008 at over $2.6 million.

22.    Subsequent to the Stock Transfers, JCMC became worthless.

23.    Subsequent to the Stock Transfers, Bi-Rite's worth became "significantly less."

24.    As of June 19, 2010, Debtor had a joint interest with Brenda in a bank account at Indiana Bank & Trust (the "Bank Account") with a balance of $33,121.80.

25.    Sometime between June 19, 2010 and July 19, 2010, Lee was removed as a joint owner of the Bank Account, thereby making Brenda the sole owner of the funds in the account at the time of the transfer.

26.    Of the funds in the account, $15,000.00 was attributable to monies paid to Brenda for a car accident in which she was involved.

27.    The Court heard no evidence as to the source of the remaining funds in the Bank Account.

28.    Between December 31, 2003 and July 2, 2009, Lee made various loans to the Lee Group and several of its wholly-owned subsidiaries, for which Lee received promissory notes payable to him (the "Notes").

29.    On July 2, 2009, Lee transferred his interest in the Notes to Brenda through an Assignment of Notes and Security Interest (the "Assignment").

30.    The Notes included in the Assignment totaled $1,395.249.65.

31.     Brenda did not provide any consideration for the Assignment beyond what she describes as "love and affection" as Lee's wife.[3]

32.     Following the Assignment, Lee made additional loans—totaling $181,765.41—to the Lee Group (the "Lee Loans").  Each of the Lee Loans was made by check written by Lee on a joint checking account of Lee and Brenda at River Valley Financial Bank.

33.     In 2011, Lee and Brenda borrowed $400,000.00 from Bloomfield State Bank and loaned $273,978.18 of those proceeds to the Lee Group.

34.     Between January 5, 2012 and December 12, 2013, Brenda received 51 bi-weekly payments of $5,000.00 each from the Lee Group, for a total of $255,000.00.

35.     On December 17, 2012, Brenda received a payment from the Lee Group in the amount of $3,500.00.

36.     On May 1, 2013, Brenda received a payment from the Lee Group in the amount of $10,000.00.

37.     On May 8, 2013, Brenda received a payment from the Lee Group in the amount of $6,000.00.

38.     On May 9, 2013, Brenda received a payment from the Lee Group in the amount of $2,400.00.

39.     On April 8, 2103, Brenda received $675,000 from the proceeds of the sale of a building owned by Marion T.

---

[3]  Together, the transfers the real estate, the bank account, the shares of stock and the notes shall be referred to as (the "Pre-petition Transfers").

40.    The above payments total $951,900.00 (the "Payments").

41.    All of the Payments were made by check, and each of the checks was signed by Lee on behalf of the Lee Group.  Brenda testified that at least some of these payments were used to pay for her and Lee's living expenses.

42.    In her sworn answers (the "Answers") to the Trustee's First Set of Written Interrogatories (the "Interrogatories"),[4] Brenda described each of the Payments as a "loan repayment."  She also indicated in her Answers that the balance owed by the Lee Group for the Notes was $360,675.06 as of July 21, 2014.  However, the Answers do not indicate when, specifically, payments were made on the Notes or against which particular Note the payment should be credited.[5]

43.    At trial, however, both Brenda and Debtor provided radically different explanations for the Payments.  For instance, the bi-weekly payment of $5,000.00 was described as compensation for her work for the Lee Group and was designed to avoid income taxation.  The $675,000.00 payment was described as Brenda's commission, in a compromised amount, for the sale of the Marion T property.

44.    On July 18, 2014, Brenda filed a *Verified Complaint* against The Lee Group in the Jennings Circuit Court under Cause No. 40C01-1407-CC-188 (the "Verified Complaint").  In it, she alleged in part that the Lee Group stopped paying

_____

[4]  The Interrogatories were served on The Lee Group in the context of Adversary Proceeding No. 13-59040 brought by the Trustee against The Lee Group.  Brenda answered the Interrogatories in her capacity as "Manager" of The Lee Group.

[5]  Interrogatory No. 2 asked the Lee Group to "identify all loans made to the Lee Group or any of its past or present subsidiaries from January 1, 2003 to the present by" by Lee or Brenda."  Interrogatory No. 3 asked the Lee Group to identify "all payments made by the Lee Group or any of its subsidiaries from January 1, 2003, to the present with respect to each loan identified in your previous response."  In answering Interrogatory No. 3, Brenda indicated that that "the repayments to the extent they exist are not tied to any particular loan making it difficult to say which loans were paid by which money."

her salary in July of 2011 because of "financial hardship." She further alleged that the Lee Group failed to pay her commission—in the amount of $600,000.00—for the sale of Marion T, LLC.

45.     After lengthy litigation in the Jennings County Circuit Court, the William R. Lee Irrevocable Trust (the "Trust") obtained a judgment against a regional network of motels known as the Lee Inns of America ("LIA") for the sum of $7,522,879.73 on December 8, 2008 (the "LIA Judgment"). At the time of the LIA Judgment, Lee was the majority shareholder of LIA, its President and its Director.

46.     In the LIA Judgment, the Jennings Circuit Court specifically found that Lee deliberating harmed the Trustee by certain acts and omissions and that such act and omissions constituted fraud. The court emphasized a public statement made by Lee wherein he promised that he would "screw [the Trust] at every opportunity" and he would "do everything to make sure [the Trust] never receive[s] one dime from this company."

47.     In July of 2008, Lee, the Lee Group, JCMC and Lee's Real Estate Investments, LLC (the "Lee Plaintiffs") filed its own action against LIA to foreclose purported security interests owed by LIA to the Lee Plaintiffs (the "Collusive Action").

48.     Lee then executed an *Amended Agreed Judgment* in the Collusive Action—signed by Lee on behalf of each of the Lee Plaintiffs *and* on behalf of LIA— that granted a judgment against LIA in favor of the Lee Plaintiffs for $7.84 million,

11

including a $3.8 million judgment against LIA in favor of Lee personally (the "Collusive Judgment").

49.     By way of an Assignment effective on August 20, 2008, Lee then conveyed all of LIA's assets to the Lee Group in satisfaction of the Collusive Judgment.

50.     Lee testified at trial that his actions were "absolutely" intended to prevent the Trust from recovering against LIA and its assets.  Lee testified that he "would have been a poor manager if [he] hadn't tried to protect the assets of people that's owed money" and that "[i]n fact, [he'd] probably got sued by all of them."

51.     On December 14, 2010, the Trust filed a *Petition to Pierce the Corporate Veil* in an effort to collect the LIA Judgment against Lee personally. That action was stayed by Lee's bankruptcy filing.

52.     Lee was diagnosed with prostate cancer in 2003.  It was suggested to him at the time of his diagnosis that he consider his estate planning.

## Conclusions of Law

1.     Pursuant to 11 U.S.C. § 544(a) and to the Indiana Uniform Fraudulent Transfer Act (the "IUFTA"), the Trustee seeks to avoid the Pre-Petition Transfers: Pursuant to 11 U.S.C. § 550(b)(1), the Trustee also seeks to recover any avoided transfer or the value thereof, from Brenda for the benefit of the estate.  By way of a separate count, the Trustee also seeks to recover the Payments from Brenda pursuant to 11 U.S.C. §§ 549 and 550.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).  Brenda has neither consented to nor objected to the Court's exercise of jurisdiction.  While the Court believes it has the constitutional authority to enter a final judgment in this matter, if a reviewing court determines otherwise, then these *Findings of Fact and Conclusions of Law* should be treated as proposed Findings of Fact and Conclusions of Law.

3.      Pursuant to Code § 544(a)(1), a trustee can "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim."  *See In re Equipment Acquisition Resources, Inc.*, 742 F.3d 743, 746 (7th Cir. 2014).  This provision allows a trustee to take advantage of state law concerning fraudulent transfers.  The relevant state law here is the IUFTA.

4.      It is the Trustee's burden to prove by a preponderance of the evidence that there was a fraudulent transfer and that recovery is appropriate.  *See Mottaz v. Oswald (In re Frierdich)*, 294 F.3d 864, 867 (7th Cir. 2002).

5.      Indiana Code § 32-18-2-14 provides:

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

   (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

   (B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

6. Much of the IUFTA has been derived from the Code's provisions concerning what is otherwise a matter of state law. Given the derivation of the IUFTA, Indiana law concerning what constitutes a fraudulent conveyance is substantially similar to the provisions of the Code which give the trustee an independent federal right to avoid such transfers. *See* 11 U.S.C. § 548. The essential difference is that the Code only allows the trustee to challenge transfers made during the two years prior to the petition, *see* 11 U.S.C. § 548(a)(1), while Indiana law allows the trustee to challenge transfers made within four years prior to the petition. *See* IND. CODE § 32-18-2-19.

7. Fraudulent intent for purposes of the IUFTA can be inferred from certain indicia called "badges of fraud." *U.S. Marketing Concepts, Inc. v. Don Jacobs Buick-Suburu, Inc.*, 547 N.E.2d 892, 894 (Ind. Ct. App. 1989). Some of the badges from which fraudulent intent can be inferred include: (1) the transfer of property by a debtor during the pendency of a suit; (2) a transfer of property that renders the debtor insolvent or greatly reduces his or her estate; (3) a series of contemporaneous transactions which strip the debtor of all property available for execution; (4) secret or hurried transactions not in the usual mode of doing business; (5) any transaction conducted in a manner differing from customary

methods; (6) a transaction whereby the debtor retains benefits over the transferred property; (7) little or no consideration in return for the transfer; (8) a transfer of property between family members. *Id*.

8.     When there is a concurrence of several badges of fraud, an inference of fraudulent intent may be warranted. *Id*. However, no one badge of fraud constitutes a per se showing of fraudulent intent. *Jones v. Central Nat'l Bank of St. Johns*, 547 N.E.2d 887, 890 (Ind. Ct. App. 1989). Rather, the facts must be taken together to determine how many badges of fraud exist and if, together, they constitute a pattern of fraudulent intent. *Lee's Ready Mix and Trucking, Inc. v. Creech*, 660 N.E.2d 1033, 1037 (Ind. Ct. App. 2001), citing *Diss v. AgriBus.Intern, Inc.*, 670 N.E.2d 97, 99-100 (Ind. Ct. App. 1996).

9.     Before applying the above standard to the Pre-Petition Transfers, the Court first discusses the transfer of the Bank Account—from joint ownership in Lee and Brenda's name to an account held only in Brenda's name.

10.     Pursuant to 11 U.S.C. § 541(a)(1), the bankruptcy estate is comprised of, "all legal and equitable interests of the debtor in property as of the commencement of the case." "'The scope of [§ 541] is broad [and] includes all types of property, including tangible or intangible property, causes of actions, and all other forms of property . . . .'" *Matter of Yonikus*, 974 F.2d 901 (7th Cir. 1992) (quoting H.R.Rep. No. 95–595, at 367 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323).

11.    However, "[w]hile federal law defines what types of property comprise the estate, state law generally determines what interest, if any, a debtor has in property." *In re O'Dowd,* 233 F.3d 197, 202 (3d Cir. 2000) (citations omitted).  The Supreme Court has stated:

> Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.  Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Butner v. U.S.,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (U.S. 1979) (citing *Lewis v. Manufacturers Nat'l Bank,* 364 U.S. 603, 609, 81 S.Ct. 347, 5 L.Ed.2d 323 (U.S. 1961).

12.    Indiana Code § 32-17-11-17 provides that [u]nless there is clear and convincing evidence of a different intent, during the lifetime of all parties, a joint account belongs to the parties in the proportion of the net contributions by each party to the sums on deposit."  Unlike some states, Indiana does not provide a presumption of ownership in the absence of such evidence. *See, e.g.*, N.J.STAT. § 17:161-4(a) (providing that "[i]n the absence of proof of net contributions, the account belongs in equal shares to all parties having present right of withdrawal.").

13.    There is evidence before the Court that $15,000.00 of the funds on deposit in the Bank Account are attributable to Brenda.  There is no evidence before the Court as to the source of the remaining funds.  In the absence of a presumption under Indiana law, the Court cannot necessarily conclude that any of the funds in

the Bank Account are attributable to Lee. As such, the Court cannot conclude that the transfer of the Bank Account effectuated a transfer of property of the Debtor for purposes of Code § 544 and the IUFTA. Accordingly, the Court concludes that such transfer is not avoidable. The Court finds no reason—given the Supreme Court's holding in to *Butner*—to disregard Indiana law to reach a different conclusion.

14.    Moving onto the remaining Pre-Petition Transfers,[6] the Court finds *overwhelming* evidence that such transfers were made with the "actual intent to hinder, delay, or defraud a creditor of the debtor."

15.    Immediately prior to the first of the Pre-Petition Transfers, the Judgment was issued against LIA. While the LIA Judgment itself was not against Lee personally, his actions, in large part, formed the basis for the LIA Judgment. The Court readily concludes that Lee anticipated that it was likely just a matter of time before the Trust pursued him personally—as it did by seeking to pierce the corporate veil on December 14, 2010.

16.    In concluding that the Pre-Petition Transfers were largely motivated by the LIA Judgment, the Court rejects Lee's argument that the transfers were made for purposes of estate planning in light of his cancer diagnosis. Debtor was diagnosed with prostate cancer in 2003—and his health had been failing for some time before that. Yet the Pre-Petition Transfers did not begin until 2009.

---

[6] From here onward, the term "Pre-Petition Transfers" does not include the transfer of the Bank Account.

17

17.     The Pre-Petition Transfers were largely contemporaneous—made between January 2, 2009 and June 19, 2010, and together, greatly reduced Lee's estate.

18.     The recipient of the Pre-Petition Transfers was Lee's wife, and she admittedly gave no consideration for them beyond "love and affection."  In the absence of other indicia of fraud, the mere fact that Brenda did not pay any monetary consideration for the Pre-Petition Transfers is insufficient evidence of fraud.  However, given the totality of the circumstances in this matter, the lack of tangible consideration is strongly indicative of fraud.

19.     These "badges of fraud" aside, the most compelling evidence before the Court is Lee's own admission that he effectuated the LIA Judgment in an effort, in the very least, to hinder and delay the Trust.  At trial, Lee himself readily admitted that he orchestrated a transfer of LIA's assets in an effort to protect them from the Trust.  The Jennings Circuit Court identified other statements made by Lee demonstrating his intention to frustrate the Trust.  It is hardly a stretch for the Court to conclude that Lee intentionally used this same strategy to protect his personal assets from the Trust and from other of his various creditors.

20.     The Court must consider, too, the conclusions reached by the Jennings Circuit Court in the LIA Judgment.  That court found compelling a statement that he himself made that he intended to do everything in his power to keep LIA and its assets from the Trust.  That pattern of behavior readily leads the Court to conclude that Lee intended to hinder, delay and/or defraud his creditors.

21.     Based on this evidence, the Court concludes that  the Pre-Petition Transfers were made with fraudulent intent in that they were designed to hinder, delay and/or defraud Lee's creditors.  As such, the transfers are hereby avoided pursuant to 11 U.S.C. § 544(a)(1) and the IUFTA.[7]

22.     Having avoided the Pre-Petition Transfers, the Court must now consider the appropriate measure of recovery under 11 U.S.C. § 550(a).

23.     Section 550(a) of the Code allows a bankruptcy trustee to recover "the property transferred, or if the court so orders, the value of such property."  Recovery under § 550(a) may be made from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

24.     "'Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.'" *Hirsch v. Steinberg (In re Colonial Realty Co.)*, 226 B.R. 513, 525 (Bankr. D. Conn. 1998) (quoting *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998)). Normally this is achieved by allowing the trustee to recover the actual property transferred.  *Id.*  However, under appropriate circumstances, the Court may, instead, award the trustee a money judgment.

25.     As explained by the bankruptcy court in *In re McLaughlin*, 183 B.R. 171 (Bankr. W.D. Wis. 1995):

---

[7] Given the overwhelming evidence of actual fraud in this case, the Court declines to discuss the Trustee's alternative argument that the Pre-Petition Transfers are avoidable as constructively fraudulent. The Court makes no finding or conclusion one way or another as to that argument.

> [T]he plain language of § 550(a) allows the trustee to recover the property transferred or its value. However, the section does not offer any guidance in determining which remedy the trustee should receive. *In re Classic Drywall, Inc.*, 127 B.R. 874, 876 (D. Kan. 1991); *In re International Ski Service, Inc.*, 119 B.R. 654, 656 Bankr. W.D. Wis. 1990). Cases have held that the language of § 550 requires that the court order the property returned unless it would be inequitable to do so. *In re General Industries*, Inc., 79 B.R. 124, 135 (Bankr. D. Mass. 1987); *In e Morris Communications NC Inc.*, 75 B.R. 619 (Bankr. W. N.C. 1987), *rev'd on other grds.*, 914 F.2d 458 (4th Cir. 1990). Other cases, however, suggest that the decision to return the property or its value is at the discretion of the bankruptcy court. *International Ski,* 119 B.R. at 656; *see also In re First Software Corp.*, 107 B.R. 417, 423 (D. Mass. 1989); *In re Vedaa*, 49 B.R. 409, 411 (Bankr. D.N.D. 1985).
>
> \* \* \* \* \*
>
> "Where the property is unrecoverable or its value diminished by conversion or depreciation, courts will permit the recovery of value." *Classic Drywall*, 127 B.R. at 877. However, if the market value of the property can be readily determined and would work a savings for the estate, the trustee may recover value rather than the property. *International Ski*, 119 B.R. at 657. The market price at the time of transfer is the proper measure of § 550 damages. *Id.* at 659.

*Id.* at 176-77 (emphasis added).

25.    Here, the Trustee seeks to recover Property Nos. 1, 3, and 4. Given that Brenda still holds the deeds to those Properties and there being no evidence before the Court as to their decline in value since their transfer, the Court agrees that the Trustee is entitled to recover Property Nos. 1, 3 and 4 from Brenda pursuant to Code § 550(a)(1).

26.    In contrast, because Property No. 2 was sold on April 28, 2010, the Trustee seeks a money judgment against Brenda in the amount of $202,345.86—the net proceeds from the sale. The Court agrees that a money judgment with respect to Property No. 2 is appropriate. Given that the sale occurred within months of the

transfer from Lee to Brenda, the Court finds the sale price to be sufficient evidence of the market value of Property No. 2 at the time of the transfer, evidence that Brenda did not attempt to counter. Accordingly, the Court concludes that the Trustee is entitled to recover $202,345.86 from Brenda pursuant to Code § 550(a)(1) with respect to Property No. 2.[8]

27. A money judgment for the Stock Transfers is also appropriate. Lee's shares in JCMC and Bi-Rite were worth a substantial sum at the time of their transfer, but according to Brenda's own testimony, the shares have since become worthless or, in the very least, worth substantially less. The best evidence before the Court as to the value of the JCMC Shares is the company's own balance sheet of December 31, 2008, just five days before the Stock Transfers. According to that balance sheet, JCMC had assets of $2,218,879.32 and liabilities of $0.00, for a net worth of $2,218,879.32.

28. Per Bi-Rite's balance sheet as of December 31, 2008, Bi-Rite had assets of $2,058,192.33 and liabilities of $723,632.23, for a net worth of $1,334,560.10. Both of these values comport with Lee's own financial statement for October 31, 2008 (which provided somewhat higher values).

---

[8] The fact that Brenda herself did not retain the sale proceeds does not alter the Court's conclusion that the Trustee is entitled to a money judgment against Brenda for the sale proceeds. The evidence shows that she was the transferee of the transfer of the property itself. The fact that she may not have enjoyed, ultimately, the proceeds of a subsequent transfer of the property—although the evidence shows that she and Lee together loaned the proceeds to The Lee Group and took a promissory note in return—does not alter her liability for the initial transfer from Lee. *See* 11 U.S.C. § 550(a)(1).

29.    Based on the depreciation of the Shares since their transfer, the Court concludes that the Trustee may recover $2,058,192.33 from Brenda for the JCMC Shares and $1,334,560.10 for the Bi-Rite Shares.

30.    That brings the Court to the Trustee's separate claim to recover the Payments.  As previously stated, Trustee also seeks to recover the Payments from Brenda under Code §§ 549 and 550.  More specifically, the Trustee argues that the Payments are recoverable because they relate directly either to the Notes transferred to Brenda per the Assignment or to the Lee Loans, i.e.,  those loan made by Lee to the Lee Group that were not included in the Assignment, the post-petition repayment of which should have inured to the benefit of the Trustee.

31.    While the Payments are certainly suspect, the Court cannot conclude from the preponderance of the evidence that they necessarily relate to Assignment or to the Lee Loans.

32.    Brenda's trial testimony that the Payments represented compensation *disguised* as loan repayments, as well as a commission from the sale of Marion T, is arguably not credible.  That testimony was inconsistent with Brenda's own verified complaint against the Lee Group.  However, the remaining evidence before the Court that the Trustee admitted to trace the Payments to specific loans—namely, Brenda's Answers to the Trustee's Interrogatories—is also less than credible.

33.    Many of Brenda's Answers to the Interrogatories contradict one another, with figures that do not add up from question to question or are inconsistent with other testimony or stipulated facts.  For instance, Brenda's

22

answer to Interrogatory No 2, wherein the Lee Group was asked to identify all loans made by Lee and Brenda between 2002 and the present, does not correspond with the Notes listed on the Assignment. The answer is also inconsistent with Brenda's trial testimony and the parties' factual stipulations. The Trustee and Brenda have stipulated that in May of 2011, Brenda and Lee borrowed $200,000.00 from Bloomfield State Bank, $73,978.18 of which was then loaned to the Lee Group. On December 23, 2011, Brenda and Lee obtained an additional loan from Bloomfield State Bank, $196,671.83 of which was loaned to the Lee Group. Those loans, however, are not reflected in her answer to Interrogatory No. 2; rather, it states that a $400,000.00 loan was made by Brenda to the Lee Group on December 23, 2011.

34.     Brenda and the Trustee also stipulated to the Lee Loans, which totaled $181,765.41. Only two of those loans, however, are reflected in Brenda's answer to Interrogatory No. 2. Her answer does acknowledge the $202,245.86 loan made to the Lee Group from the proceeds of the sale of Property No. 2, but the loan is listed as being from Lee and not from both Lee and Brenda.

35.     Brenda's Answer to Interrogatory No. 2 also does not directly correspond to the Assignment itself. Many of the loans listed in the Assignment are not disclosed in the Answers or, if they are listed (at least by date) in for an amount that does not match the Assignment.

36.     Per Interrogatory No. 10, the Trustee asked the Lee Group to disclose the balance due presently on the Notes. From Brenda's Answer, the Trustee argued

that $1,034,574.59 had to have been paid on the Notes owing from the Lee Group—
on the presumption that those amounts were paid to Brenda.  Brenda's Answers,
however, as a whole do not fully support the Trustee's argument on this point.  For
instance, the Assignment includes three notes—totaling $3,165,520.60—from Lees
Investments Management Co., LLC ("LIMC").  In her answer to Interrogatory No.
10, Brenda states that LIMC owes nothing on those notes, yet her answer to
Interrogatory No. 2 reveals no such payments from LIMC.

37.     The answer to Interrogatory No. 10 also indicates that Lees Real
Estate Investments, LLC ("LREI") owes $964,915.63 on its indebtedness to Brenda.
Yet, per the Assignment, the sole Note from LREI was in the amount of
$648,819.00.  Similarly, the balances listed in the answer for National Hospitality
Brokers, Hotel Capital Partners, LLC and L.L. Lee, LLC all far exceed the face
value of the notes listed in the Assignment.

38.     The Court simply cannot place much stock in the figures provided by
Brenda in her Answers.  While the Court does not wish to suggest that finds it finds
Brenda's testimony credible, it cannot credit her Answers either.  Without some
credible evidence before it as to the Payments, the Court is compelled to rule
against the Trustee as to the avoidance and recovery of the Payments.[9]

39.     Interrogatory No. 2 also shows sizeable payments made by the Lee
Group to Lee in the years leading up to the Assignment, yet Brenda testified that at

---

[9] This is contrary, of course, to her testimony at trial that no payments have ever been made on
the Notes, either prior to or after the Assignment.

the time of the Assignment, neither the Lee Group nor any of the other related subsidiaries had ever paid anything on the Notes.

40.    There are numerous other discrepancies in the Answers; too many to discuss at length.  Suffice to say that making sense of the Lee Group's accounting, as set forth in Answers, has been an impossible task.  While the Court does not put much stock in Brenda's trial testimony, the Answers are equally problematic.  There is no additional evidence in the record that allows the Court to reliably trace the Payments to the Notes or to the Lee Loans.

41.    As such, the Court is compelled to rule against the Trustee on his claim to recover the Payments under Code §§ 549 and 550.  Instead, the Court concludes that the Trustee is only entitled to recover the Notes themselves under Code § 550(a)(1).

42.    The Court will issue a Judgment consistent with these Findings of Fact and Conclusions of Law contemporaneously herewith.

###